**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

LISA MENDILLO,
     Plaintiff,

     v.                                   No. 12-cv-1383 (VAB)

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,
     Defendant.

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff, Lisa Mendillo, brought this action against her former employer, The Prudential Insurance Company of America ("Prudential" or "Defendant"), asserting claims for violation of the Age Discrimination in Employment Act (the "ADEA"), the Americans with Disabilities Act (the "ADA"), the Family Medical Leave Act (the "FMLA"), and the Connecticut Fair Employment Practices Act ("CFEPA"). Defendant has moved for summary judgment on all of Plaintiff's claims. *See* Doc. No. 59. For the reasons stated below, the motion is GRANTED IN PART and DENIED IN PART.

The Court GRANTS summary judgment as to the First, Fourth, Fifth, and Sixth Counts of the Amended Complaint and as to the age discrimination claim of the Third Count. The Court DENIES summary judgment as to the disability discrimination claim of the Third Count and as to the Seventh Count. The Court DENIES summary judgment on the Second Count to the extent it is based on a failure to accommodate under the ADA, but GRANTS summary judgment to the extent it is based on retaliation under the ADA.

1

## I.   FACTUAL AND PROCEDURAL BACKGROUND[1]

Born in 1962, Ms. Mendillo began working at American Skandia Life Assurance

Corporation ("Skandia") in or about April 1996.  Plaintiff's Local Rule 56(a)(2) Statement [Doc.

No. 69-24] ¶¶ 1-2.  She was hired as part of a Technical Team that ultimately became part of

Customer Service.  Mendillo Dep. [Doc. No. 69-1] 47:20-49:2.  This "eService Team" "worked

with the technology and value-added tools that [Skandia] offered to [its] financial professionals"

and also functioned like an "external help desk" for those who required technology help and web

support.  *Id.* 49:18-50:25, 53:20-23.  There also were employees independent of the eService

Team responsible for handling the Call Center function, which entailed responding to "product-

type calls and general inquiries."  *Id.* 60:22-61:13.

Prudential acquired Skandia in May 2003.  56(a)(2) Stmt. ¶ 3.  At the time, Ms. Mendillo

worked on a team of Customer Service Representatives (or "CSRs") dedicated to eService

functions, located in Shelton, Connecticut.  *Id.* ¶¶ 3-4.  In 2005, Prudential hired Gary Hogard to

oversee its two annuity call centers.  *Id.* ¶ 5.  The larger Call Center is located in Fort

Washington, Pennsylvania, which had approximately four times the number of personnel as

Shelton.  Gabriel Dep. [Doc. No. 69-2] 19:19-20:7.  At all times relevant to this action, Paula

Gabriel was the manager or director of the Shelton Call Center.  *Id.* 17:6-20, 109:21-111:9.  Ms.

Gabriel reported to Mr. Hogard.  *Id.* 20:8-14, 21:7-25.

### A.   Overview of Shelton Call Center

At the time Mr. Hogard was hired, Ms. Mendillo and other eService Team members

provided "support for the online activities of Prudential's annuity customers," while "[o]ther

---

[1] On a motion for summary judgment, the Court must accept nonmovant's evidence as true and view the record in the light most favorable to her.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000); *Emonds v. Newman Chrysler, Inc.*, No. 3:03-cv-1114, 2005 WL 293493, at *2, 2005 U.S. Dist. LEXIS 1692, at *5 (D. Conn. Feb. 4, 2005).

CSRs in the Shelton [Call Center] handled traditional customer service inquiries via telephone." 56(a)2 Stmt. ¶ 4. "The nature of the whole eService function, what we did independently as a team was to be able to support all the technology and the wholesalers and anything that came up. And it was a constant . . . testing, changing, learning.  And the Call Center was just a different function than that."  Mendillo Dep. 61:4-10.

Mr. Hogard "revamped the customer service operations."  56(a)2 Stmt. ¶ 6.  "As part of this revamping, in or around 2006, [Mr. Hogard] decided that the services exclusively performed by the e-service team should be integrated into the services provided by the rest of the CSRs." Hogard Aff. [Doc. No. 63] ¶ 5.  "[T]he idea was that we would no longer have people only doing technology all the time in an individually-staffed group."  Mendillo Dep. 62:6-8.  This "required that all CSRs be cross-trained on both traditional telephone and e-service inquiries."  Hogard Aff. ¶ 5.  Ms. Mendillo was asked to attend product training for this purpose in 2007.  Mendillo Dep. 62:12-25, 63:6-9.  She attended formal classroom training for approximately six weeks, followed by two weeks of on-the-job training, and then approximately one month of call review and quality scoring that did not count for performance management purposes.  56(a)(2) Stmt. ¶ 10.

Mr. Hogard also added a new program for evaluating the performance of Customer Service Representatives using criteria established by Dalbar, Inc., which is a company that sets performance standards for call centers in the financial service industry and ranks companies on the quality of their customer service.  56(a)(2) Stmt. ¶ 6.  The annuities business is highly competitive, and Prudential has been continuously working to improve customer service in order to help differentiate itself from other companies, with the new call quality program an important component of that effort.  56(a)(2) Stmt. ¶ 7.

The Call Center personnel worked on teams of about twelve to fifteen employees. Gabriel Dep. 29:16-24; Brand Dep. [Doc. No. 69-6] 26:13-16.  An associate manager (or "STM") ran each team and Jennifer Brand served as Ms. Mendillo's associate manager for most of the period relevant to this litigation.  *See* Doc. No. 69-3; Gabriel Dep. 27:7-9, 34:3-8.  Each team also had a service team specialist (or "STS") or "Call Coach," who was responsible, with the associate manager, for monitoring call performance of Customer Service Representatives on their team.  Gabriel Dep. 41:15-42:20; Brand Dep. 37:1-39:12; Litvinchuk Aff. ¶ 4.

In appraising an employee's performance, Prudential considered call monitoring information as one of a number of factors.  Gabriel Dep. 41:16-23.  Prudential measured the quality of a Customer Service Representative's performance in part by reviewing and scoring a sample of the recordings of telephone calls handled by that Customer Service Representative. Typically, the Call Coach would evaluate two randomly-selected calls per week for each Customer Service Representative on her team.  Gabriel Dep. 42:1-20; Litvinchuk Aff. ¶ 4.

The evaluation criteria categories are: Professionalism (10 points); Client Experience (10 points); Service Excellence (20 points); Company Initiatives (15 points); Product Knowledge (25 points); and Workflow (20 points).  Litvinchuk Aff. ¶ 6.  Each of these categories were comprised of sub-categories, and, if a Customer Service Representative missed a component of a sub-category, "that associate would lose points for the entire category," Brand Dep. 41:1-4, "even if all other elements under [that category] were covered," Litvinchuk Aff. ¶ 7.  *See also* Doc. No. 69-19, at 33.  A Customer Service Representative may challenge the scoring she receives within five days of receiving it, at which point a manager would review and either uphold or overturn the score.  Litvinchuk Aff. ¶ 8.  Call scoring involved subjective

determinations, and discrepancies in scoring would occur as a result.  Gabriel Dep. 48:3-25; Cahill Dep. 79:16-22; Thomas Dep. 38:21-40:19; Brand Dep. 41:5-43:24.

Repeatedly failing to meet call quality expectations could result in a Customer Service Representative being placed in Prudential's Performance Improvement Process (or "PIP"), which can have up to three phases: Performance Building Plan (or "PBP"); Performance Counseling (or "PC"); and Decision Making (or "DM").  56(a)(2) Stmt. ¶¶ 18-20.  The first phase, performance building, "is more of the informal process where the business works with the associate to get wherever they're lacking corrected."  Wells Dep. 77:20-23.  A Customer Service Representative could be put onto a Performance Building Plan for "inconsistent" call quality scores.  Wells Dep. 79:22-80:22; Hogard Dep. 43:7-44:9; Cahill Dep. 63:12-24.  The determination that a Customer Service Representative's call quality scores were sufficiently inconsistent to place her on performance building was made by her manager or assistant manager, and was a somewhat subjective determination that was made on a case by case basis, rather than according to any set formula or pattern.  Wells Dep. 80:8-22; Doc. No. 69-14, at 19; Brand Dep. 146:10-14; Cahill Dep. 63:25-64:3.

Once on a Performance Building Plan, a Customer Service Representative can be removed after meeting the call quality goal for three consecutive months.  Gabriel Dep. 76:13-17; Wells Dep. 96:6-8.  While in the Performance Improvement Process, the number of calls scored per month increased from eight to ten.  Litvinchuk Aff. ¶ 4.  However, if a Customer Service Representative failed or demonstrated inconsistency in meeting the quality standards after being placed on a Performance Building Plan, the Customer Service Representative could be moved to the next phase of the Performance Improvement Process, Performance Counseling.  Gabriel Dep. 89:6-10.  There are no formal procedures in place for being moved to or off

Performance Counseling; rather, such determinations are made on a case-by-case basis based on informal guidelines.  Doc. 69-14, at 21; Gabriel Dep. 113:6-115:6.  If the Customer Service Representative continues to fail to meet quality standards while on Performance Counseling, Prudential may choose to place them on Decision Making, at which point the Customer Service Representative has twenty-one days to choose to either "commit to the role and meeting their requirements," Brand Dep. 194:9-14, or to resign from the company voluntarily with a reduced severance package, Wells Dep. 175:2-6.  If the Customer Service Representative chose to stay with the company, she would have a number of additional days, which varied on a case-by-case basis, to demonstrate success—the typical length of the Decision Making period was thirty days. Wells Dep. 62:5-63:22.

These specific Performance Improvement Process practices were not embodied in written rules or policies, but instead were merely considered discretionary guidelines that reflected Prudential's typical practices.  Wells Dep. 95:21-96:4; Brand Dep. 134:22-135:3; Scott Dep. 45:8-46:9, 51:8-14.  Rather than applying hard and fast rules, Brand Dep. 135:1-3, Prudential would "review each individual situation to see what type of action was warranted," Scott Dep. 46:4-6.

### B.    Plaintiff's Employment History at Defendant

During the time relevant to this litigation, Ms. Mendillo served as a Senior Customer Service Representative, a distinct job title from the entry-level Customer Service Representative position.  A Senior Customer Service Representative demonstrated more expertise, skill, technical proficiency, and consistency than other Customer Service Representatives, and had gone "above and beyond in their role."  Thomas Dep. [Doc. No. 69-5] 19:4-12; *see also* Cahill Dep. [Doc. No. 69-4] 32:1-7; Scott Dep. [Doc. No. 69-7] 16:8-17:6, 17:24-18:7; Brand Dep.

6

28:3-9; Doc. No. 75, at 53 ("Prudential admits that a CSR was an entry level position."). Ms. Brand could not recall any other members of her team who were Senior Customer Service Representatives. Brand Dep. 35:3-6, 50:3-9. Ms. Mendillo also was one of the oldest employees at the Call Center. Mendillo Dep. 75:18-76:2. Nearly all the other members of her team were in their twenties, and the majority of all employees at the Call Center were in their twenties or early thirties. *See*, *e.g.*, Gabriel Dep. 32:5-12; Brand Dep. 34:10-14.

Prudential recognized Ms. Mendillo as an excellent and valuable employee during much of her time there, and rated her at the highest level of "exceptional contributor" in 2009, a rare accomplishment and the top accolade a Customer Service Representative could receive. Brand Dep. 44:17-45:3; Gabriel Dep. 57:7-9. "In many ways," Ms. Mendillo was more skilled than the other Customer Service Representatives. Brand Dep. 28:7-9. She possessed "technical ability . . . that other associates did not possess." Brand Dep. 28:12-14. She was the individual who led the eService training sessions for other Customer Service Representatives. Brand Dep. 97:22-98:5; Thomas Dep. 24:25-25:3. She "served as a mentor for [the Call Center's] new hire class for the eService role," Thomas Dep. 19:24-25, and because she "had the most experience in eService . . . people would come to her with questions," Brand Dep. 97:19-21.

She was considered the technical lead for customer service, meaning "anything that came as to being a project lead or subject matter expert, [she] was always given the task" by her manager. Mendillo Dep. 70:5-71:22. Even after the revamping of the Call Center eliminated the eService team as a separate group, Ms. Mendillo remained "the team lead for the EService function." Doc. No. 69-8, at 21. Ms. Mendillo was praised for "her enthusiasm for her role and flexibility daily as she adjusts to the ever-changing needs of the Contact Center," and was viewed as "a role model for others in the organization." Doc. No. 69-8, at 12. In June 2009,

Prudential awarded her an "ACHIEVE Award," Doc. No. 62-8, at 8, which "recognizes outstanding performance for employees of Prudential Annuity," Pelletier Dep. 14:16-17.

During the time relevant to this litigation, there were about six or seven different categories of calls that would come in to the Call Center; each type of call would go into a separate queue, and different Customer Service Representatives would take calls from different queues, depending on their areas of specialization. Gabriel Dep. 79:20-80:9. Ms. Mendillo's focus was on the eService, Independent Broker/Dealer, and Advanced Service Group queues. Mendillo Dep. 69:3-25. In addition to handling calls, Ms. Mendillo had numerous other job responsibilities; for example, she did "all the training, develop the manuals, [and] do the technical work with the wholesalers." Mendillo Dep. 74:14-15. These "offline" duties constituted about 50 to 70 percent of Ms. Mendillo's work. Mendillo Dep. 96:18-19; Gabriel Dep. 70:4-10; Brand Dep. 28:24-31:4.

### C.     Plaintiff's Accident and Resulting Disability

On May 16, 2010, Ms. Mendillo had an automobile accident and sustained injuries necessitating that she take leave under the Family and Medical Leave Act. Mendillo Dep. 21:22-25, 111:9-113:24; Doc. 69-10, at 5-13. Specifically, she suffered disabling injuries to the lumbar spine, right hip, right knee, right shoulder, and right elbow. Mendillo Dep. 18:13-17. "[T]hose injuries made it very difficult to sit and work in the capacity at a desk and a computer all day." Mendillo Dep. 20:5-7. As a result of the accident, she is "functional with limitations." Mendillo Dep. 20:12.

Prior to the accident, Ms. Mendillo typically arrived at the Call Center before and left after everyone else, "working ten plus hour days on a lot of project work and technical work." Mendillo Dep. 26:6-9, 235:14-16. She would work overtime. Cahill Dep. 60:6-10. After the

accident, however, she could no longer physically work a ten-hour day.  Mendillo Dep. 26:10-11.  Initially, she missed about six days of work, and then attempted to return to work, but "was in excruciating pain" and was re-evaluated the next day by her doctor, who limited her to half days.  Doc. No. 69-10, at 8; Mendillo Dep. 111:18-112:1.  After about two weeks, in or about late June, she was able to increase her workdays from four to five hours.  Mendillo Dep. 118:24-119:20.  About a month after that, around late July, she was able to raise it to six hours a day.  Mendillo Dep. 119:25-120:8.  After about another three weeks, around mid-August, she was cleared to work seven-hour workdays.  Mendillo Dep. 120:3-7.  Around mid-September 2010, Ms. Mendillo's doctor ordered her to cut back to six-and-a-half hours because she "was having a lot more back issues" and "having trouble sustaining the seven hours."  Mendillo Dep. 120:16-121:1.  Around November 2010, she was able to go back to seven hours and continued at that level until her termination in August 2011.  Mendillo Dep. 121:7-11.  After her termination, Ms. Mendillo reached the point where she would have been able to work full eight-hour days.  Mendillo Dep. 21:18-22:8.

Prudential knew about Ms. Mendillo's accident, her resulting physical condition and limitations, and her use of FMLA leave.  *See*, *e.g.*, Gabriel Dep. 93:22-25; Brand Dep. 62:16-64:4, 66:22-67:5, 137:21-138:4; Wells Dep. 30:21-31:13; Cahill Dep. 59:6-14, 120:24-121:13; Thomas Dep. 42:9-43:7; Doc. No. 69-12, at 1-10.  Her supervisors also knew that Ms. Mendillo required accommodations after suffering her accident.  Brand Dep. 64:7-66:16; Gabriel Dep. 95:23-97:17.  Ms. Mendillo brought the challenges and limitations imposed by her physical condition directly to Prudential's attention repeatedly during the remainder of her employment there.  *See*, *e.g.*, Doc. No. 69-14, at 29; Gabriel Dep. 132:10-11.  Prudential has an accommodations unit to address such issues, and while Ms. Mendillo's supervisors discussed

whether the unit might be able to assist them with what they described as Ms. Mendillo's scheduling-related problems caused by her FMLA leave, the unit never appears to have suggested any accommodations for Ms. Mendillo nor to have contacted her to discuss her disability.  *See* Doc. No. 69-13, at 32; Wells Dep. 91:16-92:22; Gabriel Dep. 96:20-97:12; Brand Dep. 64:7-68:15, 136:15-138:4; Scott Dep. 46:14-49:25.

> **D.   Plaintiff's Performance Evaluations and Discharge**

Ms. Mendillo's 2007 annual performance appraisal shows that Ms. Mendillo met or exceeded expectations in every category of her competency evaluation.  Doc. No. 69-8, at 30-33; Brand Dep. 70:15-23.  Her overall performance rating was 4 out of 5, or "Exceeds Expectations."  Doc. No. 69-8, at 35.  Her appraisal noted that she "is an exceptional employee who is highly respected by her peers as a leader in the Call Center."  Doc. No. 69-8, at 34.  That year, the goals for both "overall call quality" and "service excellence" were 92%; Ms. Mendillo scored 93% on call quality and 91% on service excellence.  As noted *supra*, the job responsibilities at the Call Center shifted drastically that year, with all Customer Service Representatives expected to handle both traditional telephone and e-service inquiries.

Ms. Mendillo's performance appraisal noted that she "was recognized by her Call Center trainer . . . for her perserverance [*sic*] throughout training and a positive attitude during this period of transition," who stated that she was "truly a role model to me and to others here in the Annuities Call Center" and "a treasure who captures the essence of Customer Service and the true Client Experience."  Doc. No. 69-8, at 34.  Her call quality performance results for the year were "solid," and she was "recognized throughout 2007 by both internal employees as well as external callers for her outstanding service."  *Id.*  Her job performance earned her multiple awards in 2007.  *Id.*

In 2008, Ms. Mendillo once again received an Overall Performance Rating of 4, now retitled as "High Contributor."  Doc. No. 69-8, at 24; Brand Dep. 74:6-8.  She once again met or exceeded expectations in every category of her competency evaluation.  Doc. No. 69-8, at 20-22. The goal for overall call quality was again 92%, but in this year, Ms. Mendillo only scored 91%. Because of her inconsistent call quality scores in the first half of 2008, Ms. Mendillo had been placed on a Performance Building Plan, effective June 27, 2008, with a target date to achieve the call quality goal of October 31, 2008.  Doc. No. 65-15.  Ms. Mendillo received call quality scores of 94% in June, 85% in July, 93.5% in August, 93.5% in September, and 93.3% as of October 17, 2008.  Doc. No. 65-15.

Ms. Mendillo's 2008 performance appraisal noted that she "should continue to focus on consistency with the [call] quality program to ensure the new goals of 93% for 2009 are met," but that she "has delivered significant results in her job performance in 2008" and "continues to make contributions with a focus on the organization as a whole."  Doc. No. 69-8, at 23.  It also noted that as "the team lead for the Eservice function," Ms. Mendillo worked on many projects with employees in other departments, and that she "partners with many throughout the organization for the benefit of our callers."  Doc. No. 69-8, at 21.  In addition, she provided "continual training to our Eservice call takers."  *Id.*

In 2009, Prudential raised the overall call quality goal from 92% to 93%.  Doc. No. 69-8, at 7, 23  Ms. Mendillo received a score of 94%, and even received a perfect 100% score in January of that year.  Doc. No. 69-8, at 7.  Once again, she met or exceeded expectations in every category of her competency evaluation.  Doc. No. 69-8, at 9-11.  Ms. Mendillo's overall performance rating this year was "Exceptional Contributor," the equivalent of previous years' "5" rating.

Ms. Mendillo's 2009 performance appraisal noted that she "continued her strong relationships not only within the Contact Center, but also with our . . . partners" in numerous other departments, and that she was "sought out by these groups and also peers across both Contact Centers for her outstanding website expertise."  Doc. No. 69-8, at 10.  It also noted that she was "extremely diligent when it comes to escalated cases and will ensure timely resolution to exceed our caller's expectations."  *Id.*  She also "worked additional hours to support our eService offline activities as we realigned resources to assist our Client Acquisitions Team."  *Id.*

Her appraisal recognized that she demonstrated "enthusiasm for her role and flexibility daily as she adjusts to the ever-changing needs of the Contact Center-often switching from the role of call taker, to one of processor, to one of project analyst," and that "[t]hrough each twist and turn, [she] constantly displays a positive attitude and shares her energy constantly with her team members."  Doc. No. 69-8, at 12.  Her supervisor encouraged her "to continue her drive for excellence by consistently maintaining her [call] quality and handle time metrics."  *Id.*

Like 2008, 2010 began with inconsistent call quality scores for Ms. Mendillo, and she was placed on a Performance Building Plan, effective May 6, 2010.  Doc. No. 65-16.  Ten days later, Ms. Mendillo's car accident occurred and she could not return to work until nearly the end of the month and gradually increased her workdays over the next six months from half-days to seven-hour days.  Because of Ms. Mendillo's reduced hours, Prudential initially reduced the number of her calls that were being scored to four.  Cahill Dep. 94:9-24; Brand Dep. 113:4-18.  Ms. Mendillo achieved the call quality score goals in June and July.  Gabriel Dep. 80:10-15.  However, she would not have made the goal in one of those months if she had not challenged the scoring of one of her calls.  Mendillo Dep. 136:4-16.

During this time, Ms. Mendillo challenged her call scoring regularly.  Mendillo Dep. 136:17-19.  She filed more challenges than most Customer Service Representatives.  Thomas Dep. 57:4-6, 58:5-14.  In August 2010, the number of her calls being scored was doubled to eight, possibly without any advance notice to Ms. Mendillo.  Brand Dep. 117:11-119:1; Doc. No. 69-12, at18-19, 22; Doc. No. 69-13, at 2.  Ms. Mendillo failed to meet the call quality goal in August by one percentage point, scoring 92%.  Doc. No. 62-10.

Ms. Mendillo's August score fell below the goal because of a deduction she received on one call for not stating the hours of operation when closing the call.  Gabriel Dep. 80:19-81:25; Cahill Dep. 127:16-128:12; Brand Dep. 153:12-24.  If this deduction had not been made, Ms. Mendillo's August score would have met the call quality goal and she would have been removed from the Performance Building Plan.  Gabriel Dep. 86:12-17; Brand 119:11-121:2.  While she did not follow the formal challenge process with respect to this call score, Ms. Mendillo did ask for her score to be corrected, and Prudential denied this request.  Cahill Dep. 98:13-99:13; Scott Dep. 57:10-22; Gabriel Dep. 82:1-9; Brand Dep. 120:25-121:7, 154:3-14.

In early September, Prudential asked Ms. Mendillo to train other employees on the eService function.  Gabriel Dep. 87:3-5; Brand Dep. 143:15-20; Mendillo Dep. 96:6-7.  Shortly thereafter, Prudential removed all of her offline eService work responsibilities and made her job exclusively telephone work.[2]  Gabriel Dep. 82:18-22, 84:7-16; Brand Dep. 56:17-21; Mendillo Dep. 91:14-18, 96:13-14 .  Ms. Mendillo protested the removal of her offline work.  Gabriel Dep. 6-13.  At the same time her offline work was taken away, Ms. Mendillo's call volume increased drastically.  In the four months before her injury in 2010, Ms. Mendillo was averaging about 390 calls per month.  In the two months following her injury, Ms. Mendillo handled 129 and 184

---

[2] These responsibilities were then redistributed to a few of Ms. Mendillo's colleagues, all of whom were younger than Ms. Mendillo.  *See, e.g.*, Brand Dep. 143:21-144:8.

calls.  She worked her way back up to 265 calls in August, but when her offline work was taken

away in September, her call volume spiked to 665 for the month.  Doc. No. 69-13, at 23.  Her

monthly call volume remained above six hundred for the rest of 2010.  Doc. No. 69-13, at 23.

Ms. Mendillo warned her manager that being put full time on telephone work would

cause exacerbation of her back pain.  Mendillo Dep. 152:15-25 ("[W]hen she said we're going to

put you on a hundred percent phone work; I said, it's hard when you can't get up and stretch.

My back is spasming.  At least when I do the project work, I can stand up, I can stretch my back,

try to lean back and move.").  Ms. Mendillo's physical condition did worsen after her offline

work was removed, and resulted in her physician ordering her to cut back her workday hours.

Mendillo Dep. 150:5-151:2.  Initially, Ms. Mendillo's call quality score took a precipitous drop,

only scoring 79% for September.  Doc. No. 69-13, at 23; *see also* Mendillo Dep. 96:17-24 ("You

can see a dramatic difference in scores when they removed me from my project work.  I was

doing 70 percent offline work and 30 percent call work.  So you're taking maybe seven to ten

calls a day.  And then they flipped a switch and said, start taking calls all day in September, after

they had me finish training a class.  And when they did that, my call scores dramatically

dropped.").  In addition to a greater volume of calls, Ms. Mendillo also began receiving different

types of calls than the ones she had been accustomed to handling.  Doc. No. 69-14, at 16; Brand

Dep. 145:6-11.

Ms. Mendillo raised her call quality scores back up in the subsequent months, scoring

91.5% in October and then surpassing the call quality goal in November and December by

scoring 94.5% and 95% in those months, respectively.  Doc. No. 69-13, at 23.  Ms. Mendillo's

regular Call Coach was on leave in November and December 2010, and her calls were scored by

another person during those months.  Mendillo Dep. 90:21-25; 164:13-19.  Purdential informed

Ms. Mendillo in mid-November that she would be placed on Performance Counseling. Doc. No. 69-13, at 32-34. She protested, however, that placing her on Performance Counseling was contrary to the conditions she had been told she had to meet in order to avoid being placed on Performance Counseling, and so Prudential gave Ms. Mendillo "the benefit of the doubt" and "did not proceed with performance counseling" at that time. Gabriel Dep. 99:9-100:2; *see also* Brand Dep. 141:4-16.

The goal for overall call quality in 2010 was 93%, but Ms. Mendillo only scored 91% for the year. Doc. No. 69-15, at 8. Ms. Mendillo's 2010 performance appraisal, however, noted that she "[u]nderstands the 'big pictures' and works to support those strategies," and that, throughout the year, she "worked to support the company and there were many ownership stories to support her dedication to the strategy of the business." Doc. No. 69-15, at 12. For example, she led the development of a program that "result[ed] in over $20,000 saved for the organization." Doc. No. 69-15, at 16.

Her performance appraisal also noted that she "struggled to meet her core performance metrics, specifically call quality," and that "[h]er results were below expectations for her role." The appraisal recognized that she "strives to exceed [our callers'] expectations and as a result has received numerous complimentary calls" and "was recognized publicly by one of our Top Financial Professionals . . . for her outstanding service support." Doc. No. 69-15, at 14. Her supervisor noted that she "is focused on providing an outstanding client experience each time, all the time," and that "[t]his is evidenced in . . . complimentary calls received." Doc. No. 69-15, at 20. Still, her appraisal concluded that her overall call performance in 2010 "was not consistent and she did not meet all expectations." *Id.*

As Ms. Mendillo remained on a Performance Building Plan in January 2011, she requested to listen to some calls with perfect scores to determine how she could improve, but upon listening to them, she discovered that on some of these calls the Customer Service Representatives had made errors that should have resulted in deductions but did not.  Doc. No. 69-14, at 31; Brand Dep. 158:6-159:15.  Ms. Mendillo brought this issue up with Prudential, and her conclusions were confirmed by the resulting audit.  Brand Dep. 159:16-20; Scott Dep. 28:25-29:4; Gabriel Dep. 48:23-25.

Prudential raised the overall call quality goal again in 2011, from 93% to 94%.  Doc. No. 69-14, at 28.  In early February 2011, Prudential met with Ms. Mendillo to discuss extending the Performance Building Plan because it appeared that she had missed the 94% goal for the month of January; however, Ms. Mendillo had in fact met the call quality goal for January 2011.  Gabriel Dep. 129:5-14.  Because she had achieved the call quality goal in three consecutive months, Prudential removed Ms. Mendillo from the Performance Building Plan.  Doc. No. 69-15, at 2.  "However, it was made clear that should she miss another month in the future she could go directly to Performance Counseling."  Doc. No. 69-15, at 2.  Further, Prudential expected that going forward, Ms. Mendillo "needs to be the leader for not just the team but for the Contact Center" in terms of her call quality performance.  Doc. No. 69-15, at 2; Gabriel Dep. 136:5-137:1; Brand Dep. 172:11-16.

Shortly thereafter, Ms. Mendillo received her annual performance appraisal for 2010, in which she received an overall performance rating of "Greater Contributions Are Needed," which is the second lowest rating on a five-point scale.  Doc. No. 69-15, at 21.  Ms. Mendillo refused to sign the appraisal because, as she protested to her managers, she believed it was unfair.  Doc. No. 69-15, at 21; Brand Dep. 179:17-21; Gabriel Dep. 148:25-150:13.  Ms. Mendillo wrote a detailed

description of the elements of her 2010 appraisal that she felt were unfair.  Doc. No. 69-15, at 25-26.

At her request, Ms. Mendillo was given a meeting with Mr. Hogard and Lisa Wells, the Call Center human resources professional, to discuss her concerns with her appraisal.  Gabriel Dep. 153:4-8.  Mr. Hogard indicated to her that her manager "would be beefing up" her appraisal, and Ms. Wells directed Ms. Gabriel "to change some of the wording on the appraisal." Mendillo Dep. 90:11-12; Gabriel Dep. 153:13-25.  However, even after some revisions were made, Ms. Mendillo's overall performance rating remained unchanged.  Mendillo Dep. 90:5-16; Brand Dep. 181:18-23.  Ms. Mendillo continued to object to the revised appraisal, requesting further revisions, but her managers do not appear to have addressed the issues she raised.  Doc. No. 69-15, at 30-31; Gabriel Dep. 155:1-156:18; Brand Dep. 186:18-187:9.

At the end of February 2011, Ms. Mendillo's call quality score was 91.25%, short of 2011's 94% goal.  Even after she successfully challenged the scoring, which resulted in raising her monthly score to 93.13%, she remained still shy of the goal, and Prudential placed her on Performance Counseling around March 15, 2011.  Gabriel Dep. 158:12-160:8; Doc. No. 69-15, at 34-37; Brand Dep. 183:15-184:11; Mendillo Dep. 199:5-20; Doc. No. 69-15, at 40; Doc. No. 62-13.  Ms. Mendillo immediately protested in writing being placed on Performance Counseling and requested a meeting with human resources.  Doc. No. 69-15, at 43-44.  She pointed out that it was the first time in her fifteen-year career at the company that she had ever been presented with any type of Performance Counseling document, and that she had consistently met or exceeded the call quality goal over the prior four months, even though there had been numerous scoring errors made with her calls.  Doc. No. 69-15, at 43.  Around this time, Ms. Mendillo also

17

asked Prudential if she could transfer to another role, but Ms. Gabriel did not allow her to apply for other positions.  Mendillo Dep. 198:11-13.

In response to Ms. Mendillo's request for a meeting and her objections to being placed on Performance Counseling, Ms. Wells met with her on March 31, 2011, but Prudential did not accept her arguments.  Gabriel Dep. 177:13-180:15.  Consequently, Ms. Mendillo continued to refuse to sign the Performance Counseling memorandum.  Cahill Dep. 119:2-8.  Furthermore, in early April, Ms. Mendillo reached out to her managers to present ideas on ensuring that the call quality guidelines were clearer and more fairly applied.  Prudential developed a "plan" to deal with her issues because Ms. Mendillo's managers wanted to make sure that there would be no further complaints from her, particularly regarding allegedly differential treatment she was receiving.  Gabriel Dep. 181:4-22, 182:23-183:12; Doc. No. 69-16, at 2-4.  Mr. Hogard met with Ms. Gabriel and Sarah Litvinchuk, Prudential's Division Manager for Call Quality and Dalbar Relationship, to discuss this plan, but Ms. Gabriel does not remember, nor is there record evidence reflecting, what specifically was discussed.  Gabriel Dep. 181:23-183:15.

At this time, Ms. Mendillo's scoring challenges were not being independently reviewed, but were being closely monitored by Ms. Gabriel, who was consulted on the review determinations.  *See* Wells Dep. 55:12-56:12; Thomas Dep. 66:20-67:3, 67:24-68:9 Doc. No. 69-16, at 6; Doc. No. 69-19, at 13-16.  Ms. Mendillo's immediate supervisor, Ms. Brand, was also required to check with Ms. Gabriel regarding how to respond whenever she received a communication from Ms. Mendillo expressing concern with the way her performance was being evaluated, and was required to document meetings she had with Ms. Mendillo.  Doc. No. 69-14, at 26; Gabriel Dep. 185:1-186:16.

Prudential removed Ms. Mendillo from Performance Counseling on May 26, 2011; she had scored 96% on call quality during her Performance Counseling period.  Doc. No. 69-16, at 25.  However, the company also told her that if she missed the call quality score in any given month going forward, she would move to Decision Making.  Doc. No. 69-16, at 22-23.  At this time, Mr. Hogard questioned Ms. Gabriel regarding why Ms. Mendillo had not already been moved to Decision Making, considering that Ms. Mendillo had scored 92% for the month of May, thereby missing the 94% goal, and was informed that it was because Ms. Mendillo's score during the Performance Counseling period superseded the monthly score, and to move her to Decision Making at that point "essentially would be double dipping."  Doc. No. 69-16, at 25; Gabriel Dep. 189:1-190:20.

In June 2011, Ms. Brand left the Call Center and Melissa Thomas[3] took over her position as Ms. Mendillo's manager.  Thomas Dep. 25:16-24.  Ms. Thomas had a meeting with Ms. Mendillo on June 15, 2011 and Ms. Mendillo again expressed concern with getting clarification on specific call standards and requirements and with inconsistencies with scoring.  Doc. No. 69-16, at 31; Thomas Dep.70:2-71:16.  In late June or early July, Ms. Thomas advised Ms. Mendillo that she would have to achieve the call quality goal for July, or Prudential may consider moving forward with Decision Making.  Thomas Dep. 81:15-18; Mendillo Dep. 211:3-4.  The two had another meeting on July 6, 2011 and Ms. Mendillo again disputed the scoring of several of her June calls, and again expressed concern about inconsistent scoring, stating that it seemed calls may be scored according to personal feelings towards a Customer Service Representative.  Doc. No. 69-16, at 33-34; Thomas Dep. 87:8-88:16.

For the month of June, Ms. Mendillo scored 91.25%, short of the call quality goal of 94%.  She had eight calls scored during the month: she received 100% scores on the first four,

---

[3] After this time, then-Melissa Hanson married and legally changed her name to Melissa Thomas.

then scores of 85%, 65%, and 80% on the next three, and finally 100% on her last scored call for the month.  Doc. No. 69-17, at 3.  Ms. Mendillo challenged the scoring of the three sub-100% calls, but while her challenges to the scoring of those three calls were still pending, Ms. Gabriel presented Ms. Mendillo with Decision Making around July 14, 2011.  Doc. No. 69-17, at 3; Doc. No. 69-16, at 41-43; Mendillo Dep. 211:4-10; Thomas Dep. 94:5-20; Wells Dep. 160:21-22.  In addition, Prudential's written call quality monitoring policies specified that two calls should be reviewed per week and that no two calls should be pulled from the same day.  Doc. No. 69-12, at 30, 53.  In June 2011, Ms. Mendillo had calls scored on three consecutive days during the course of one week, and also arguably had two calls pulled on the same day.  Doc. No. 69-17, at 3, 21-23; Mendillo Dep. 213:9-19; Gabriel Dep. 193:19-25, 196:9-18; Wells Dep. 159:5-25.  Ms. Gabriel knew of the challenged call scores, as well as of Ms. Mendillo's objection to how her calls were selected for scoring during the month of June.  Gabriel Dep. 192:7-12, 198:14-25; Doc. No. 69-17, at 21-23.  Ms. Gabriel denied Ms. Mendillo's three June score challenges. Gabriel Dep. 192:20-25.

Ms. Mendillo also met with Stephen Pelletier, then the president of Prudential's annuities division, on or about July 20, 2011.  She met with him for about 15 to 30 minutes. She complained about how she was being treated, and he advised her that she should speak with Ms. Wells and Mr. Hogard so that they were aware of her interest in staying with Prudential and possibly looking into other opportunities there.  Mendillo Dep. 263:9-265:23; Pelletier Dep. 27:17-19.  Ms. Mendillo once again discussed the possibility of transferring to a different role at Prudential, this time with Ms. Wells, but because she was on Decision Making just as when she was on Performance Counseling, she was not allowed to post for other positions.  Wells Dep. 147:9-25.  However, this time, Ms. Gabriel did give Ms. Mendillo permission to apply for other

positions, but she was only able to apply for a "couple" of positions during the limited time provided.  Mendillo Dep. 229:8-230:7.

Ms. Mendillo also met with Timothy Cronin, a senior vice president working under Mr. Pelletier, on July 25.  Doc. No. 69-19, at 2; Mendillo Dep. 266:1-3.  Mr. Cronin had discussed Ms. Mendillo's situation with Mr. Pelletier, and they were both surprised at the difficulties she was having with her management because they knew her to be an excellent employee.  Cronin Dep. 18:6-13, 20:20-21:2, 25:11-13.  Ms. Mendillo met with Mr. Cronin several times to discuss her predicament.  Doc. No. 69-19, at 2-4; Cronin Dep. 30:3-16, 31:10-13.  Mr. Cronin called Mr. Hogard to inquire about the situation, and Mr. Hogard, in a brief conversation, made clear that he has a structure, guidelines, policies, procedures, expectations, and goals for his department. Cronin Dep. 19:22-25.

As discussed *supra*, when a Customer Service Representative is placed on Decision Making, she has twenty-one days to either commit to the role and meet the requirements or resign from the company voluntarily with a reduced severance package.  Gabriel Dep. 200:25-201:5; Brand Dep. 194:9-14; Wells Dep. 62:5-63:22, 175:2-6.  If a Customer Service Representative on Decision Making chooses to stay with the company, typically, she would have nine additional days to demonstrate success.  After the twenty-first day of her thirty-day Decision Making, Ms. Mendillo was meeting the call quality goal, and she elected to recommit rather than accept a severance package.  Gabriel Dep. 200:19-201:8; Doc. No. 69-16, at 43. However, in the last nine days of Decision Making, Ms. Mendillo's score dropped below the goal for the Decision Making period, and Ms. Gabriel, Ms. Wells, and Mr. Hogard fired her. Gabriel Dep. 65:2-23; Wells Dep. 173:17-19.  This score drop was based on a review of three calls during the final nine-day period of Decision Making, two of which Ms. Mendillo had

lodged challenges to before she was discharged.[4]  Doc. No. 69-16, at 13-16; Gabriel Dep. 203:15-206:3; Wells Dep. 63:24-64:20.

For example, Ms. Mendillo challenged a deduction she received on one of the two calls because the then-current Prudential guidance document she was following in conducting her calls did not indicate that the element she was penalized for not including was applicable to that call.  *See* Doc. No. 69-16, at 14.  Ms. Litvinchuk was responsible for reviewing call score challenges.  Litvinchuk Aff. ¶ 9; Wells Dep. 55:12-56:12; Thomas Dep. 66:20-67:3, 67:24-68:9. After reviewing this challenge, Ms. Litvinchuk wrote an e-mail to Ms. Gabriel, stating: "UGGGG.  It is not on this document.  Thoughts?  Still presents risk to the company. Exceptions have still been made based on it."  Doc. No. 69-16, at 13.  Ms. Gabriel responded, "Don't do anything...Let it go.  Just keep me updated on anything she sends you."  Doc. No. 69-16, at 16.

Prudential terminated Ms. Mendillo's employment on August 18, 2011.  Am. Compl. [Doc. No. 23] ¶ 24.  She immediately began applying for a number of other positions at Prudential, but was never considered.  Doc. No. 69-10, at 15-23; Am. Compl. ¶ 28.  On or about February 14, 2012, Ms. Mendillo timely filed administrative charges of discrimination and retaliation with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC").  Am. Compl. ¶ 5.  She received a release of jurisdiction from both the CHRO and EEOC and then filed this lawsuit.

---

[4] In addition, as part of the Decision Making, Ms. Mendillo received an Interim Performance Review, which reflected that, as of August 17, 2011, she was exceeding the overall call quality goal for the year with a 94.53% score, and included a great deal of praise for her job performance in general.  Doc. No. 69-17, at 12-14; Gabriel Dep. 212:23-214:18.

## II.      STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and the undisputed facts warrant judgment for the moving party as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 172 (2d Cir. 2005).  When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law."  *Id.*  Only those facts that must be decided in order to resolve a claim or defense will

prevent summary judgment from being granted.  Immaterial or minor facts will not prevent summary judgment.  *See Howard v. Gleason Corp.*, 901 F. 2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  Furthermore, the Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  However, the inferences drawn in favor of the nonmovant must be supported by evidence.  "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment, *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir. 1997), as is the "mere existence of a scintilla of evidence in support of the [nonmovant's] position," *Liberty Lobby*, 477 U.S. at 252.

## III.   DISCUSSION

Plaintiff's Amended Complaint [Doc. No. 23] brings claims under seven counts.  In the First Count, Ms. Mendillo alleges that Prudential discriminated against her on the basis of her age in violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 623(a).  The Second Count alleges that Prudential failed to accommodate her disability in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12111 *et seq.*, that the lack of accommodation led to her unlawful termination, and that she also was retaliated against under the ADA.  The Third Count alleges that, in discriminating against Ms. Mendillo on the basis of her age and disability, Prudential also violated the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a).  The Fourth Count alleges retaliation in violation of the ADEA, while the Fifth Count alleges retaliation in violation of the CFEPA.  The

Sixth Count alleges interference with Ms. Mendillo's rights in violation of the Family Medical

Leave Act ("FMLA"), 29 U.S.C. § 2615(a).  Finally, the Seventh Count alleges retaliation under

the FMLA.  For the following reasons, the Court GRANTS summary judgment as to the First,

Fourth, Fifth, and Sixth Counts of the Amended Complaint and as to the age discrimination

claim of the Third Count.  The Court DENIES summary judgment as to the disability

discrimination claim of the Third Count and as to the Seventh Count.  The Court DENIES

summary judgment on the Second Count to the extent it is based on a failure to accommodate

under the ADA, but GRANTS summary judgment to the extent it is based on retaliation under

the ADA.

### A.    Statute of Limitations

Defendant argues that most of Ms. Mendillo's claims of alleged discriminatory conduct

are time barred, and thus cannot form the basis for claims under the ADEA, the ADA, or the

CFEPA.  The ADA and ADEA "require claimants to file a charge of discrimination or retaliation

with the [EEOC] within 300 days of the discriminatory or retaliatory act."  *Valtchev v. City of*

*New York*, 400 F. App'x 586, 588 (2d Cir. 2010) (citations omitted).  A CHRO complaint under

CFEPA "must be filed within one hundred and eighty days after the alleged act of

discrimination."  Conn. Gen. Stat. § 46a-82(f).  Ms. Mendillo filed her claims with the EEOC

and CHRO on February 12, 2012.  Def. Br. [Doc. No. 60], at 18; Pl. Br. [Doc. No. 69], at30.

Therefore, she may only bring suit for discriminatory or retaliatory acts under the ADA or

ADEA occurring on or after April 18, 2011, and for violations of the CFEPA occurring on after

August 16, 2011.

All of the alleged acts from which damages are purported to arise in this action, however,

occurred within the statutes of limitations for filing claims with the EEOC and nearly all

occurred within the statute of limitations for filing claims with the CHRO.  Moreover, Ms.

Mendillo is not barred "from using the prior acts as background evidence in support of a timely

claim."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  Therefore, the

statutes of limitations do not bar any of Mendillo's claims.

### B.     First and Fourth Counts: ADEA Claims

The ADEA's purpose is to "promote employment of older persons based on their ability

rather than age [and] to prohibit arbitrary age discrimination in employment[.]"  29 U.S.C.

§ 621(b).  The ADEA's prohibitions protect employees who are at least forty years of age.  29

U.S.C. § 631(a).  Plaintiff brings claims against Defendant under the ADEA for age

discrimination and retaliation, and Defendant has moved for summary judgment on those causes

of action.

### 1.     First Count: Age Discrimination Under the ADEA

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or

otherwise discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's age [or] to limit, segregate,

or classify his employees in any way which would deprive or tend to deprive any individual of

employment opportunities or otherwise adversely affect his status as an employee, because of

such individual's age[.]"  29 U.S.C. § 623(a).

In the Second Circuit, ADEA discrimination claims are analyzed using the burden-

shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as

modified by *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).  *See Gorzynski v. JetBlue

Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010).  Under this framework,

> the plaintiff bears the initial burden of establishing a prima facie case of
> discrimination.  If the plaintiff does so, the burden shifts to the defendant to

articulate 'some legitimate, nondiscriminatory reason' for its action.  Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination.

*Id.*  At the final stage, the plaintiff can satisfy its burden either by establishing that "the employer's proffered reason was a pretext for discrimination" or "by presenting facts, which taken in his favor, suffice to show that a triable issue exists as to whether his age was a 'but for' cause of his termination." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (internal quotation marks and citations omitted).  A district court must take "a case-by-case approach" to this determination, "examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000).  For example, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . .  Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000).  In terms of establishing age as the but for cause of the employer's action, age must be "an antecedent but for which the result in question would not have occurred," even if it "combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back." *Burrage v. United States*, 134 S. Ct. 881, 888 (2014).

### a.	Prima Facie Case

"In order to establish a prima facie case of age discrimination, [plaintiff] must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under

circumstances giving rise to an inference of discrimination." *Gorzynski*, 596 F.3d at 107.  The plaintiff bears a "de minimis burden" at this stage. *Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 22 (2d Cir. 2011).  Ms. Mendillo has satisfied this burden.

Prudential does not contest the first or third elements of the prima facie case.  Therefore, the only issues are whether she was qualified for the position and whether the alleged adverse employment actions occurred under circumstances giving rise to an inference of discrimination based on Plaintiff's age.  In this case, Ms. Mendillo was one of the oldest employees at the Call Center.  Virtually all the other members of her team were younger, and Ms. Mendillo has presented evidence that, while she was employed, many of her duties were re-distributed among several of these significantly younger employees.  *See*, *e.g.*, Mendillo Dep. 91:14-18 ("They changed my job and my career and my functions in September of 2010 . . . and dramatically changed my career."); Gabriel Dep. 82:14-84:12 ("[W]e removed her from the eService offline activity[.]"); Brand Dep. 143:21-144:8 ("There would have been other associates given those tasks. . . .  AJ would have gotten some of it.").  The transfer of a plaintiff's job responsibilities to a substantially younger employee suffices to establish an inference of age discrimination at the prima facie stage of analysis.  *See*, *e.g.*, *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000); *Collins v. Connecticut Job Corps*, 684 F. Supp. 2d 232, 249 (D. Conn. 2010).

Prudential also argues that Ms. Mendillo was not qualified for the position because she was not performing her job satisfactorily at the time of termination.  The Court disagrees.

> Under the qualification prong of the prima facie case, the Court will only examine whether or not [a plaintiff] had the basic skills for the position.
> To show qualification, the plaintiff does not need to show perfect performance or even average performance, but only needs to show that he 'possesses the basic skills necessary for performance of the job.'

*Vernon v. Port Auth. of New York & New Jersey*, 154 F. Supp. 2d 844, 856 (S.D.N.Y. 2001) (quoting *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir.2001)).  The record contains ample evidence demonstrating that she possessed the basic skills necessary for performance of her job. After all, she had been performing these job responsibilities for Prudential for over fifteen years at the time of her termination.

The Court finds that Ms. Mendillo has satisfied her minimal burden of establishing a prima facie case of age discrimination under the ADEA.

### b.      Legitimate, Nondiscriminatory Reason

Prudential likewise has satisfied its burden and provided a legitimate, nondiscriminatory reason for terminating Ms. Mendillo:  poor performance, specifically her failure to maintain the required call quality scores.  There is record evidence indicating that: (1) Ms. Mendillo failed to achieve the required call quality goals in certain months; (2) Prudential initiated the Performance Improvement Process as a result; (3) that she moved progressively through the three phases of the Performance Improvement Process—the Performance Building Plan, Performance Counseling and Decision Making—for continuing inconsistent call quality scores; (4) once on Decision Making, Prudential warned Ms. Mendillo that, if she failed to meet performance requirements while on Decision Making, she would be discharged; and (5) she failed to meet certain performance requirements while on Decision Making.

### c.      Pretext

In this case, a reasonable juror could not infer from the record evidence that Prudential's proffered nondiscriminatory reason for Ms. Mendillo's termination is pretextual and that her age was the real reason.  A plaintiff alleging employment discrimination "may prevail only if an employer's proffered reasons are shown to be a pretext *for discrimination*, either because the

pretext finding itself points to discrimination or because other evidence in the record points in

that direction—or both." *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1339 (2d Cir. 1997); *see also*

*Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 201 (2d Cir. 1999) (finding that "the pretext in

and of itself does not suggest age discrimination").  In this case, even if a jury were to determine

that Prudential's articulated reason is false, it could not find based on the record that age was the

real reason.

Plaintiff argues that younger employees similarly situated to Plaintiff were treated more

favorably, a fact which, if established, could satisfy both the prima facie and pretext prongs.  *See*

*Julian v. Securitas Sec. Servs. USA, Inc.*, No. 3:08-cv-1715, 2010 WL 1553778, at *9-10, 2010

U.S. Dist. LEXIS 38129, at *23-29 (D. Conn. Apr. 19, 2010) (evidence that six younger

coworkers engaged in proscribed conduct similar to plaintiff and were not penalized as severely

held sufficient for age discrimination claim to survive summary judgment).  "An employee is

similarly situated to co-employees if they were (1) 'subject to the same performance evaluation

and discipline standards' and (2) 'engaged in comparable conduct.'"  *Trachtenberg v. Dep't of*

*Educ.*, 937 F.Supp.2d 460, 471 (S.D.N.Y. 2013) (quoting *Ruiz v. Cnty. of Rockland*, 609 F.3d

486, 493-94 (2d Cir. 2010)); *see also Aiello v. Stamford Hosp.*, No. 3:09-cv-1161, 2011 WL

3439459, at *15, 2011 U.S. Dist. LEXIS 87121, at *41 (D. Conn. Aug. 8, 2011) ("to satisfy the

all material respects standard for being similarly situated, a plaintiff must show that his co-

employees were subject to the same performance evaluation and discipline standards").  Here, it

is undisputed that all Customer Service Representatives were subject to the same performance

evaluation and discipline standards; in fact, Prudential explicitly argues that "Plaintiff was held

to the same standards as all other CSRs."  Def. Br., at 25.  Thus, a reasonable juror could find

that Ms. Mendillo was similarly situated to the other Customer Service Representatives in her office.

The record evidence, however, does not demonstrate that younger employees were treated more favorably than older ones.  To the contrary, at least one younger Customer Service Representative was treated just as Ms. Mendillo was for comparable conduct: he failed to meet call quality goals consistently, Prudential initiated the Performance Improvement Process in December 2010, and Prudential discharged him shortly after Ms. Mendillo for continuing to fall short of the goals.  *See* Doc. Nos. 64-2; 65 ¶ 19; 56(a)(2) Stmt. ¶ 54; Doc. No. 65-11.  Thus, a reasonable juror could not infer from the evidence in the record that younger employees were treated more favorably, and without such a finding, there is nothing in the record upon which a reasonable juror could conclude that the real reason for Ms. Mendillo's discharge was age. "Without a nexus between her age and termination, [a plaintiff's] evidence cannot surmount the requisite 'but for' hurdle."  *Rubinow v. Boehringer Ingelheim Pharm., Inc.*, 496 F. App'x 117, 119 (2d Cir. 2012) (affirming grant of summary judgment on age discrimination claims).  As a result, summary judgment as to Ms. Mendillo's ADEA claim for age discrimination is granted.

### 2.      Fourth Count: Retaliation under the ADEA

Retaliation claims under the ADEA are also analyzed using the *McDonnell Douglas* burden-shifting formula.  *See Kessler v. Westchester Cnty. Dep't of Social Servs.*, 461 F.3d 199, 205 (2d Cir. 2006).  To establish a prima facie case of retaliation under the ADEA, "a plaintiff must show (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (internal quotation marks and citations omitted).  "[P]roof of

causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir.2010) (internal quotation marks and citation omitted).

"If a plaintiff sustains the initial burden, a presumption of retaliation arises. In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005). "[O]nce an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* .

Ms. Mendillo's claim of retaliation in violation of the ADEA must fail because she has not shown that she participated in any protected activity under that statute. While it is undisputed that she did register many complaints with Prudential about her treatment, there is no evidence in the record that any of her complaints alleged discrimination based upon her age. Therefore, summary judgment is granted on the Fourth Count of the Amended Complaint.

### C.   Second Count: Violation of ADA

Title I of the ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to" any employment decision. 42 U.S.C. § 12112(a). The ADA defines discrimination to include both adverse employment actions based on the employee's disability, *see id.*, and "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless

[the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business," 42 U.S.C. § 12112(b)(5)(A).

### 1.    Failure to Provide Reasonable Accommodation

To establish a prima facie case on a reasonable accommodation claim, a plaintiff must prove that "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (internal quotation marks and citations omitted).  In analyzing failure to accommodate claims, the plaintiff first must prove that "an accommodation exists that permits her to perform the job's essential functions."  *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995).  "If the plaintiff meets that burden, the analysis shifts to the question whether the proposed accommodation is reasonable; on this question the burden of persuasion lies with the defendant."  *Jackan v. New York State Dep't. of Labor*, 205 F.3d 562, 566 (2d Cir. 2000). "Whether or not something constitutes a reasonable accommodation is necessarily fact-specific," and "determinations on this issue must be made on a case-by-case basis."  *Wernick v. Fed. Reserve Bank of New York*, 91 F.3d 379, 385 (2d Cir. 1996).

The Second Circuit has held that held that "an employee's request for an accommodation triggers a duty on the part of the employer to investigate that request and determine its feasibility."  *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 185 (2d Cir. 2006) (internal quotation marks and citation omitted).

> Under the ADA, employers and employees share responsibility for determining an appropriate accommodation, through a flexible, interactive process.  The employee possesses the initial responsibility to inform the employer that she needs an accommodation, and to identify the limitation that needs

> accommodating.  An employer has no duty to provide an accommodation for a disability of which it has no knowledge.  However, the ADA does not require employees to suggest a specific type of accommodation in order to trigger the employer's obligation to investigate which reasonable accommodations, if any, might be appropriate.  Once an individual with a disability requests accommodations, the responsibility for fashioning a reasonable accommodation is shared between the employer and the employee.  At this point, the employer must make a reasonable effort to determine an appropriate accommodation based on the particular job involved and consultation with the employee.

*Worthington v. City of New Haven*, No. 3:94-cv-00609, 1999 WL 958627, at *13, 1999 U.S. Dist. LEXIS 16104, at *38-40 (D. Conn. Oct. 5, 1999) (citations omitted).  An employee " 'need not mention the ADA or even the term "accommodation" ' so long as the employer has knowledge of the disability." *Id.* (quoting *Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994)); *see also Medlin v. Rome Strip Steel Co.*, 294 F. Supp. 2d 279, 292 (N.D.N.Y. 2003) (noting that "so long as the employee makes the employer aware of his condition and that some accommodation is requested, the employer has at least some responsibility to reasonably engage in the interactive process and determine the appropriate accommodation").

Here, Ms. Mendillo informed her employer of her physical constraints resulting from her accident, emphasizing that she could not sit for prolonged periods, and requested that she be allowed to continue doing offline projects in conjunction with her telephone work, so that she could have breaks during the day from the uninterrupted sitting required by the telephone work. Prudential admits that there were reasonable options available to accommodate her disability. *See* Defendant's Local Rule 56(a)(1) Statement [Doc. No. 61] ¶ 51 (noting that accommodations available at Prudential to someone with Plaintiff's disability included "walking breaks, a different chair, or a standing desk").  Prudential argues that it did not have notice of Ms. Mendillo's need for accommodation because her doctor's notes did not specify that she could not sit for prolonged periods, and that it had no obligation to offer her any reasonable

accommodations because she did not specifically request any of the ones that it could have offered.

The law in the Second Circuit, however, recognizes that "an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious—which is to say, if the employer knew or reasonably should have known that the employee was disabled," whether or not the employee has requested an accommodation or even acknowledges that she has a disability. *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008). As a result, this claim should proceed to trial where, as here, Ms. Mendillo disclosed her condition and physical limitations directly to her supervisor and Prudential failed to determine whether a reasonable accommodation could have been offered for her inability to sit for prolonged periods. Summary judgment therefore is denied on Ms. Mendillo's ADA claim based on a failure to accommodate her disability.

### 2.    Unlawful Discharge

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . discharge of employees." 42 U.S.C. § 12112(a). To analyze a claim for unlawful discharge under the ADA, the Court must follow the familiar *McDonnell Douglas* burden-shifting framework: the "plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir.2009) (internal quotation marks omitted).

### a.     Prima Facie Case

"In order to establish a prima facie case of discriminatory discharge, a plaintiff must show that: (1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation; and (4) she was fired because of her disability." *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir. 1998).  The Second Circuit has instructed that "[t]o make out a *prima facie* case is not a demanding burden."  *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998).

Defendant does not contest that it is subject to the ADA, nor that Plaintiff was disabled within the meaning of the ADA.  As discussed *supra*, Plaintiff was qualified for her position. Finally, "'[f]ailure to consider the possibility of reasonable accommodation for . . . disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities.'"  *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 143 (2d Cir.1995)) (alteration in original).  Since there is a genuine issue of material fact concerning whether Prudential failed to accommodate Ms. Mendillo's disability, as discussed *supra*, this disputed fact may support an inference that she was fired because of her disability, satisfying her prima facie case and shifting the burden to Defendant.

### b.     Pretext

As also discussed *supra*, Prudential has provided a legitimate, nondiscriminatory reason for Ms. Mendillo's discharge—her failure to maintain the required call quality scores consistently.  Therefore, the ultimate burden of persuasion falls to Ms. Mendillo to establish that Prudential's articulated reason is pretextual.  The Court finds, when the record is reviewed as a

whole, that there is sufficient evidence to create a genuine issue of fact as to whether Defendant's reason was a pretext for discrimination.

The evidence indicates that Prudential's accommodations unit could have contacted Ms. Mendillo to discuss possible accommodations that may have helped address her disability-related limitations.  Thus, a reasonable juror could infer that the articulated reason for her discharge may not have been the true reason; it instead might have been a desire to avoid accommodating her disability.

Accordingly, the Court concludes that there are genuine issues of material fact as to Plaintiff's disability discrimination claim for unlawful discharge set forth in Count Two and denies Defendant's motion for summary judgment as to this claim.

### 3.        Retaliation

The ADA makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  "Claims for retaliation are analyzed under the same burden-shifting framework established for Title VII cases."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

### a.        Prima Facie Case

"To establish a prima facie case of retaliation under the ADA, a plaintiff must establish that (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action."

*Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999).  "A plaintiff's burden at this prima facie stage is *de minimis*."  *Treglia*, 313 F.3d 713, 719 (2d Cir. 2002).

Viewing the record in the light most favorable to Plaintiff, she still fails to establish a prima facie case.  First, "protected activity" refers to formal or informal complaints protesting or opposing statutorily prohibited discrimination and must put the employer on notice that the plaintiff believed that discrimination was occurring.  *Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 267 (E.D.N.Y. 2015).  Even if Ms. Mendillo's conversation with her supervisor regarding her physical impairments qualifies as participating in a protected activity, thereby satisfying the first prong, *see id.* at 268, there is nothing in the record from which to infer that Prudential understood that she was engaging in protected activity.  Instead, Prudential claims not to have been aware that Ms. Mendillo was protesting or opposing disability discrimination and Ms. Mendillo offers no evidence to the contrary.  While Prudential's failure to engage with Ms. Mendillo is enough to support her failure to accommodate claim under the ADA going forward to a jury, it does not support an ADA retaliation claim, even though Ms. Mendillo's discharge qualifies as an adverse employment action.  In any event, nothing in the record establishes a causal connection between the protected activity, *i.e.*, her conversation with her supervisor about her physical condition, and the adverse employment action.  The two were not even temporally proximate, having occurred nearly eleven months apart.

Based on the failure to satisfy prongs two and four of the prima facie case, summary judgment must be granted as to Plaintiff's ADA retaliation claim.

**D.      Third and Fifth Counts: CFEPA Claims**

       **1.      Third Count: Discrimination Under the CFEPA**

The CFEPA is generally "coextensive" with federal anti-discrimination statutes, *see*

*Brittell v. Dep't of Correction*, 247 Conn. 148, 164 (1998), and similarly prohibits employers

from discriminating or retaliating against individuals because of their age or disability, Conn.

Gen. Stat. Ann. § 46a-60(a)(1).  Plaintiff has brought CFEPA claims based on being

"discriminatorily denied . . . equal treatment on the basis of her age and disability in violation of

C.G.S. Section 46a-60(a)."  Amended Complaint at ¶¶ 44-50.  Without reaching the issue of

whether a combined age and disability discrimination claim exists under Connecticut law, the

Court analyzes these two claims under CFEPA as two distinct ones, dismissing the former, while

retaining for trial the latter.

       **a.      Age Discrimination Under the CFEPA**

CFEPA claims for age discrimination are analyzed generally according to corresponding

federal precedent: courts apply the traditional *McDonnell Douglas* burden-shifting framework

established for Title VII claims.  *See Hopkins v. New England Health Care Employees Welfare*

*Fund*, 985 F. Supp. 2d 240, 259 (D. Conn. 2013).  There is some uncertainty concerning whether

the motivating factor test still applies for CFEPA age discrimination claims post-*Gross*.  *See*,

*e.g.*, *Dwyer v. Waterfront Enters., Inc.*, No. CV126032894S, 2013 WL 2947907, at *6-7, 2013

Conn. Super. LEXIS 1174, at *17-23 (Conn. Super. Ct. May 24, 2013); *Weisenbach v. LQ*

*Mgmt.*, No. 3:13-cv-01663, 2015 WL 5680322, at *8-9, 2015 U.S. Dist. LEXIS 128839, at*31-

34 (D. Conn. Sept. 25, 2015).  However, the question is irrelevant in this case.  For the reasons

discussed *supra* with respect to her ADEA claim, Plaintiff likewise cannot establish that age was

a motivating factor in her discharge—there is no evidence connecting Ms. Mendillo's age to any

of Prudential's adverse employment actions.  Therefore, summary judgment is granted with respect to Plaintiff's CFEPA age discrimination claim.

### b.  Disability Discrimination Under the CFEPA

"Discriminatory claims brought under CFEPA, Conn. Gen. Stat. § 46a–60 *et seq.* are construed similarly to ADA claims, with Connecticut courts reviewing federal precedent concerning employment discrimination and retaliation for guidance in enforcing the CFEPA," except that "CFEPA's definition of physical disability is broader than the ADA's."  *Hopkins v. New England Health Care Employees Welfare Fund*, 985 F. Supp. 2d 240, 255-56 (D. Conn. 2013) (internal quotation marks omitted).  Because Ms. Mendillo was disabled under the narrower ADA for purposes of summary judgment, this difference does not affect the Court's analysis of the CFEPA claims.

Therefore, for the reasons discussed *supra* in analyzing the ADA discrimination claim, Defendant's motion for summary judgment is denied with respect to Plaintiff's CFEPA disability discrimination claim.

### 2.  Fifth Count: Retaliation under the CFEPA

Plaintiff has asserted claims of retaliation in violation of the CFEPA.  Courts approach such claims in generally the same manner as they do retaliation claims brought under federal anti-discrimination laws.  *See Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 286 (D. Conn. 2008) ("ADEA and CFEPA retaliation claims both use the *McDonnell Douglas* burden-shifting framework."); *Gomez v. Laidlaw Transit, Inc.*, 455 F. Supp. 2d 81, 90 (D. Conn. 2006) ("CFEPA retaliation claims are analyzed in the same manner as ADA retaliation claims.").  As discussed *supra*, Plaintiff has failed to establish her prima facie case for retaliation under both the ADEA

and the ADA, and therefore summary judgment likewise must be granted on the Fifth Count of the Amended Complaint.

### E.      Sixth and Seventh Counts: FMLA Claims

The FMLA entitles eligible employees "to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1).

> [T]he FMLA does not require a complete inability to work fulltime . . . but rather permits leave to be taken 'intermittently or on a reduced leave schedule when medically necessary,' 29 U.S.C. § 2612(b)(1).  'A reduced leave schedule is a leave schedule that reduces an employee's usual number of working hours per workweek, or hours per workday' and intermittent leave is 'taken in separate blocks of time due to a single qualifying reason.'  29 C.F.R. § 825.202(a).

*Santiago v. Dep't of Transp.*, 50 F. Supp. 3d 136, 145 (D. Conn. 2014).  The Second Circuit has recognized two theories of liability under the FMLA: interference and retaliation.  *See*, *e.g.*, *Potenza v. City of New York*, 365 F.3d 165, 167-68 (2d Cir. 2004).  "A plaintiff may assert both claims."  *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 182 (D. Conn. Apr. 27, 2015).

### 1.      Sixth Count: Interference with Rights under FMLA

"While the Second Circuit has yet to set forth a standard to apply to FMLA interference claims, the weight of authority in the Circuit holds that in order to establish a prima facie case of interference in violation of the FMLA a plaintiff must show that: (1) [she] is an 'eligible employee' under the FMLA; (2) that the employer is an employer as defined in the FMLA; (3) that [she] was entitled to leave under the FMLA; (4) that [she] gave notice to the employer of his intention to take leave; (5) that [she] was denied benefits to which he was entitled under the FMLA."  *DeAngelo*, 105 F. Supp. 3d at 182 (internal quotation marks and citations omitted).  Defendant does not contest the first four prongs of the prima face case, but argues that Ms. Mendillo was never denied any benefits to which she was entitled under the FMLA.

"With interference claims, the issue is simply whether the employer provided the employee with the entitlements set forth in the FMLA—for example, a twelve-week period of leave or reinstatement following a medical leave.  The employer's subjective intent is not an issue." *Wanamaker v. Town of Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 69 (D. Conn. 2014).  Because intent is not a factor, Plaintiff need not establish that Defendant meant to deprive her of her FMLA entitlements.  Accordingly, Plaintiff concedes that Prudential gave her all of the FMLA leave she requested, but argues that Prudential effectively deprived her of certain entitlements under the FMLA.

"Substantive rights under the FMLA subject to interference claims include the right to take leave, receive benefits during leave and be restored to the same or equivalent position following leave." *DeAngelo*, 105 F. Supp. 3d at 182 (D. Conn. 2015) (internal quotation marks and citation omitted).  For her interference claim, Ms. Mendillo

> need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her.  She can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both. . . .  No scheme shifting the burden of production back and forth is required.

*Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 175-76 (2d Cir. 2006).  In addition, the FMLA requires an employer to return an employee to the same position the employee held when leave commenced, or to an equivalent position, upon the employee's return from FMLA leave.  29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.214.  Finally, when an employee is on intermittent leave or leave on a reduced leave schedule, the FMLA allows an employer to transfer an employee temporarily to an available alternative position offered by the employer for which the employee is qualified, that has equivalent pay and benefits, and that better accommodates recurring periods

of leave than the regular employment position of the employee.  29 U.S.C. § 2612(b)(2); 29

C.F.R. § 825.204(a).

It is undisputed that, after Ms. Mendillo returned from her full-time FMLA leave and

while she was still on FMLA intermittent/reduced schedule leave, Prudential removed a

substantial portion of her job responsibilities.  However, she was not transferred to an alternative

position.  She was in the same position she held when her leave commenced.  Further, the

evidence indicates that the duties that were taken away from her during her intermittent/reduced

schedule leave are typically taken away from Customer Service Representatives who are having

difficulty meeting the call quality goal.  *See* Hogard Dep. 47:5-23 (Prudential removed non-call

duties from "anybody who was having trouble with quality"); Scott Dep. 15:12-20 ("It was

standard practice at the time to remove off-line activity when folks were struggling with their

quality results.").  "An employee has no greater right to reinstatement or to other benefits and

conditions of employment than if the employee had been continuously employed during the

FMLA leave period."  29 C.F.R. § 825.216(a).

Because the record does not indicate that Prudential interfered with any of Ms.

Mendillo's entitlements under the FMLA, the Court grants summary judgment on the Sixth

Count of the Amended Complaint.

### 2.     Seventh Count: Retaliation under FMLA

The *McDonnell Douglas* burden-shifting analysis applies to FMLA retaliation claims,

requiring that a plaintiff's prima facie retaliation case show that: "(1) he exercised rights

protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse

employment action; and (4) the adverse employment action occurred under circumstances giving

rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168. Defendant does not contest the first prong, and, as discussed *supra*, Plaintiff was qualified for the position.

With respect to the third and fourth prongs, the record reflects that Prudential subjected Ms. Mendillo to increasingly severe stages of the Performance Improvement Process the longer she was on FMLA leave, took away a significant portion of her job responsibilities while she was on FMLA intermittent/ reduced schedule leave, and terminated her employment while she was still exercising her right to FMLA leave. These facts are sufficient to satisfy the third and fourth prongs of the prima facie case. *See Wanamaker*, 11 F. Supp. 3d at 78 (noting that "actions that the Second Circuit has deemed sufficiently disadvantageous to constitute an adverse employment action have included a less distinguished titled, significantly diminished responsibilities, or other indices unique to a particular situation").

As discussed at length *supra*, Prudential has articulated a legitimate, nondiscriminatory reason for Ms. Mendillo's discharge: her inconsistent call quality scores. The evidence, however, reflects that Prudential appeared to be concerned with Ms. Mendillo's "challenges managing her schedule with FMLA." Scott Dep. 47:2-3. "There was a concern . . . around the doctor's appointments and other obligations." Brand Dep. 65:17-19. A reasonable juror could infer from such evidence, as well from the evidence making up her prima facie case, that Prudential's articulated reason for discharge was pretext and that the real reason was retaliation for Ms. Mendillo's continuing use of FMLA intermittent/reduced schedule leave.

Viewing the record in the light most favorable to Plaintiff, the Court must deny summary judgment as to the Seventh Count of the Amended Complaint.

**III.     CONCLUSION**

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendant's motion for summary judgment [Doc. No. 59], as follows.  The Court GRANTS summary judgment as to the First, Fourth, Fifth, and Sixth Counts of the Amended Complaint and as to the age discrimination claim of the Third Count.  The Court DENIES summary judgment as to Second and Seventh Counts and as to the disability discrimination claim of the Third Count.

SO ORDERED at Bridgeport, Connecticut, this 12th day of January, 2016.


     /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge